1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   BILL BRADY,                              No. CIV S-06-2298-JAM-CMK

12              Plaintiff,

13      vs.                                   <u>FINDINGS AND RECOMMENDATIONS</u>

14   MIKE KUYPER, et al.,

15              Defendants.

16   _____/

17              Plaintiff, proceeding pro se, brings this civil action regarding seizure of cattle.

18   Pending before the court is defendants' motion for summary judgment (Doc. 46).  Plaintiff filed

19   an opposition to the motion[1] (Doc. 53), and defendants filed a reply (Doc. 54).  A hearing on this

20   matter is was taken off calendar pursuant Local Rule 78-230(c), (h).

21   **I.      BACKGROUND**

22              Plaintiff commenced this action on October 18, 2006.  Pursuant to 28 U.S.C.

23   § 1915(e)(2), the court was required to screen plaintiff's complaint.  Accordingly, the court found

24   _____

25        [1]      Plaintiff's opposition was filed late.  The court may disregard a late filed
     opposition.  However, the court recognizes Plaintiff is proceeding pre se, and will take into
26   account his untimely opposition.

                                                  1

1    plaintiff's complaint asserted cognizable claims against defendants Mike Kuyper and Ralph

2    Mauck for deprivation of his property without proper due process.  Plaintiff's complaint also

3    named two federal agencies, the Bureau of Land Management (BLM) and the Department of the

4    Interior, as defendants.  The two agencies were dismissed as defendants to this action, and this

5    action proceeds against the two individual defendants.  (See Docs. 10, 43).  The individual

6    defendants filed a motion to dismiss, which was granted in part and denied in part.  (See Docs.

7    40, 45).

8          Plaintiff's complaint alleges that the BLM impounded his cattle without providing

9    him proper notice of the seizure.  He claims he did not get a trespass notice until April 18, 2005,

10   12 days after the cattle were impounded.  He alleges he had a meeting with defendant Kuyper

11   regarding the return of his cattle, and was told he had to provide proof of ownership and had to

12   have a brand inspection.  However, no further meeting was held prior to the cattle being sold at

13   auction.  Plaintiff alleges his constitutional due process rights were violated.

14         Following the partial granting of the motion to dismiss, this action proceeds

15   against defendants Kuyper and Mauck, in their individual capacities only, on Plaintiff's claim of

16   due process violation pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of

17   Narcotics, 403 U.S. 388 (1971).  Any tort claims Plaintiff attempted to claim have been

18   dismissed.

19   **II.    MOTION FOR SUMMARY JUDGMENT**

20         Defendants bring this motion for summary judgment pursuant to Rule 56(c) of the

21   Federal Rules of Civil Procedure.  Defendants argue Plaintiff was provided multiple

22   opportunities to prove the cattle were his, but he was unable to establish his property interest

23   therein.  They claim they followed all the proper procedures in allowing Plaintiff an opportunity

24   to prove the cattle were his.  In addition, they argue they are entitled to qualified immunity

25   because Plaintiff's constitutional right was not clearly established, and even if it was, no

26   reasonable officer would have known their actions were unlawful.

1    Plaintiff argues that he was not provided due process to prove his ownership in the

2    cattle.  He states numerous meetings were set up and cancelled, and he was not allowed an

3    opportunity to participate in the State Brand Inspector's determination of ownership.

4    **A.    Summary Judgment Standards**

5    Summary judgment is appropriate when it is demonstrated that there exists "no

6    genuine issue as to any material fact and that the moving party is entitled to a judgment as a

7    matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

8    . . . always bears the initial responsibility of informing the district court of
     the basis for its motion, and identifying those portions of "the pleadings,
9    depositions, answers to interrogatories, and admissions on file, together
     with the affidavits, if any," which it believes demonstrate the absence of a
10   genuine issue of material fact.

11   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

12   "[W]here the nonmoving party will bear the burden of proof at trial on a

13   dispositive issue, a summary judgment motion may properly be made in reliance solely on the

14   'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed,

15   summary judgment should be entered, after adequate time for discovery and upon motion, against

16   a party who fails to make a showing sufficient to establish the existence of an element essential

17   to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.

18   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

19   necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

20   should be granted, "so long as whatever is before the district court demonstrates that the standard

21   for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

22   If the moving party meets its initial responsibility, the burden then shifts to the

23   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

24   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

25   establish the existence of this factual dispute, the opposing party may not rely upon the

26   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

1  form of affidavits, and/or admissible discovery material, in support of its contention that the

2  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

3  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

4  of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

5  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

6  that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

7  for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

8          In the endeavor to establish the existence of a factual dispute, the opposing party

9  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

10  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

11  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

12  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

13  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

14  committee's note on 1963 amendments).

15          In resolving the summary judgment motion, the court examines the pleadings,

16  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

17  any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See

18  Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed

19  before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

20  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

21  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

22  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

23  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

24  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

25  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

26  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

**B.     Due Process**

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  In order to prevail on a claim of deprivation of due process, a plaintiff must first establish the existence of a liberty or property interest for which the protection is sought; it then has to be decided "what procedures constitute 'due process of law.'"  Ingraham v. Wright, 430 U.S. 651, 672 (1977) (citations omitted); see also Bd. of Regents v. Roth, 408 U.S. 564, 569-70 (1972).  Due process protects against the deprivation of property where there is a legitimate claim of entitlement to the property.  See Bd. of Regents, 408 U.S. at 577.  Protected property interests are created, and their dimensions are defined, by existing rules that stem from an independent source – such as state law – and which secure certain benefits and support claims of entitlement to those benefits.  See id.

It is well settled that "some form of hearing is required before an individual is finally deprived of a property interest."  Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (citing Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974)).  While "'[d]ue process is flexible and calls for such procedural protections as the particular situation demands,'" "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Id. (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972); Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  However, there can be circumstances "that justifies postponing the hearing until after the event."  Boddie v. Connecticut, 401 U.S. 371, 378-79 (1971).  "A predeprivation hearing may be postponed 'where some valid governmental interest is at stake.'"  First Nat. Bank & Trust v. Dep't of Treasury, 63 F.3d 894, 896 (9th Cir. 1995) (quoting U.S. v. James Daniel Good Real Prop., 510 U.S. 43, 53 (1993)).

To determine whether a predeprivation hearing is required, a balancing of three factors is required: "First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable

value, if any, of additional or substitute procedural safeguards; and finally, the Government's

interest, including the function involved and the fiscal and administrative burdens that the

additional or substitute procedural requirement would entail." <u>Mathews</u>, 424 U.S. at 335.

### C.    Substantive Law

The defendants summarize the statutory and regulatory law regarding cattle

grazing and ownership as follows, which Plaintiff does not contest:

**BLM Regulations Regarding Unauthorized Grazing on Public Lands**

> The Taylor Grazing Act of 1934 requires the Secretary of the Interior to protect, administer, regulate, and improve grazing districts on public land. 43 U.S.C. § 315a. In particular, it requires him to make rules and regulations "to regulate [the grazing districts'] occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, to provide for the orderly use, improvement, and development of the range." <u>Id.</u> These regulations make it illegal to allow livestock such as cattle to graze on public grazing lands without a permit. 43 C.F.R. §§ 4140.1(b)(1)(I), 4150.1, 4100.0-5 (definition of "livestock" includes cattle).

> If BLM finds unauthorized cattle grazing on public land, BLM provides written notice of the unauthorized use to the owner and orders their removal by a specified date. 43 C.F.R. § 4150.2(a). If the owner does not remove the unauthorized cattle by the date in the notice, BLM may impound and dispose of the cattle as specified in BLM's regulations. 43 C.F.R. § 4150.4. If cattle are to be sold, BLM is to provide written notice to any known owners or agents regarding the sale of the unauthorized cattle and the procedure by which they may redeem the cattle. 43 C.F.R. § 4150.4-3. If the cattle are not redeemed before the time fixed for their sale, they are offered at public sale to the highest bidder. 43 C.F.R. § 4150.4-5. If the owner of the unauthorized cattle is not known, the BLM may proceed to impound them under § 4150.4 as well, but it must consult the State Brand Inspector to determine who the proper owner of the cattle is. 43 C.F.R. § 4150.2(c); BLM Handbook H-4150-1 at 12. (attached as Exhibit 1 to Declaration of Dayne Barron, Court Docket Number 26). If the proper owner cannot be determined, impounded cattle may be turned over to the State for disposal if the State has estray laws which permit disposal of such livestock. 43 C.F.R. § 4150.4-3; BLM Handbook BLM Handbook H-4150-1 at 12.

/ / /

/ / /

**California Requirements Regarding Cattle Ownership**

California has enacted a comprehensive scheme for regulating ownership of cattle. People v. Casey, 41 Cal. App. 4th Supp. 1, 49 Cal. Rptr. 2d 372 (1995); California Food and Agriculture Code ("CFAC") §§ 20001 et seq. The California Bureau of Livestock Identification oversees this regulatory program, which is carried out and enforced by state officials known as Brand Inspectors. CFAC §§ 20401-20406, 20432-20440. Under this scheme, each cattle owner registers a distinct brand with the State and places that brand on his or her cattle so that they can be identified as they intermingle on the range. Casey, 41 Cal. App. 4th Supp. at 5. The transfer of cattle to another owner "must be supervised by a state brand inspector and evidenced by a trail of bills of sale and legally altered brands." Id.; CFAC §§ 21051(a) (brand inspection required for sale or transfer), 21052 (same), 21072 (bill of sale required for sale or purchase). The Brand Inspector must examine "the cattle for all brands and marks, and, in the case of unbranded cattle, for natural marks, sex, and breed." § 21171. The Brand Inspector must also issue a detailed certificate of inspection. §§ 21171, 21203. The bill of sale must give "the number, kind, breed, and sex, and, if branded, the brand and location of the brand on each animal." § 21702. An "estray" is any impounded or seized cow whose owner is unknown or cannot be located, and any estray that is seized by, or comes into the possession of, an inspector shall be disposed of by the Inspector as specified by the state regulations. §§ 17001.5, 17002.

(Memorandum of Points and Authorities, Doc. 47, at 5-6).

**D.    Discussion**

Plaintiff contends he was denied due process in regards to the impounding of 34 head of cattle he alleges were his property.  He maintains that he was not given notice before the cattle were impounded, and in fact was not notified or given a trespass notice until after the cattle were seized, which violated his due process rights.

Defendants bring this motion on the basis that they followed all of the proper procedures, and went beyond what was required in providing Plaintiff the opportunity to prove the cattle impounded belonged to him.  By way of background, according to the defense, sometime prior to November 2004, the BLM noticed unauthorized cattle grazing public lands, and began proceedings against George Cramer for grazing his cattle on BLM lands without a permit.  George Cramer owned cattle with a registered brand "box 1."  Following notice to Mr.

7

Cramer, in March 2005, the BLM impounded his livestock.  Mr. Cramer was provided an opportunity to redeem his cattle.  Mr. Cramer failed to do so, and the cattle were sold.  In April 2005, the BLM found additional cattle bearing Mr. Cramer's "box 1" brand grazing on BLM lands, and began impounding them.[2]

There are two possible incidents Plaintiff could be claiming violated his due process rights.  The first would be in relation to the initial impounding of the cattle on April 6, 2005.  The second would be in relation to the disposal of the cattle on or about May 13, 2005.

### 1.   Undisputed Facts

The following are the undisputed facts, listed by the Defendants and which Plaintiff admits:

> 4.   BLM . . . impounded 34 cattle grazing without authorization on BLM's Observation Allotment on April 6, 2005;
> 5.   Of the 34 impounded cattle, 25 of the cattle bore Cramer's "box 1" brand and 2 were unbranded calves nursing "box 1" branded cows;
> 6.   Except in rare circumstances, calves will only nurse their mothers and mothers will only allow their calves to nurse them;
> 7.   The remaining seven impounded cattle bore "horseshoe J" brands, of which three were calves nursing "box 1" branded cows, along with four yearlings;
> 11.  Plaintiff Bill Brady claimed to own all the cattle impounded on April 6, 2005;
> 12.  Bill Brady ("Brady") did not have a permit or other authorization from the U.S. Bureau of Land Management ("BLM") to graze cattle on BLM's Observation Allotment;
> 14.  On April 11, 2005, Mauck spoke with Mr. Brady and informed him that the Regional Brand Inspector needed to speak to Mr. Brady and Cramer to make a determination about the ownership issue.  Mauck also informed Mr. Brady that Mauck had not yet had an opportunity to determine the fees and damages the true owner would have to pay for grazing unauthorized cattle;
> 16.  On April 18, 2005, Kuyper personally served a Trespass Notice on Brady, explained it to him, and told him he needed to speak to the Brand Inspector;
> 17.  Kuyper met with Brady about the cattle on April 22, and told him he needed to talk to the Brand Inspector about the question of who owned the cattle.

---

[2]   Plaintiff "denies" these facts, stating he has no knowledge of them, but does not specifically contest them, argue against them, or provide any evidence opposing them.

23.     On May 3, 2005, Kuyper met with Mr. Brady in BLM's Susanville office regarding the cattle;

24.     At the May 3, meeting, Brady presented Kuyper with a handwritten document entitled "Sales Agreement" dated 3/10/03 for the sale of thirteen head of longhorn cattle for $500 each, and said that he had paid Cramer approximately $1000 to date for the cattle[3];

26.     Brady never presented a certificate of brand inspection for any of the 34 cattle impounded on April 6, 2005, to the BLM.

34.     Mr. Brady did not file an administrative claim for the value of the cattle with BLM, and BLM is unaware of Mr. Brady filing any such claim with the State.

35.     On June 23, 2005, BLM notified Mr. Brady that it was closing its trespass case against him.

Separate Statement of Undisputed Facts, Doc. 50.

These undisputed facts establish that on April 6, 2005, the BLM impounded more cattle it believed belonged to Mr. Cramer, bearing the "box 1" brand.  A total of 34 cattle were impounded including 25 bearing Mr. Cramer's "box 1" brand, three calves bearing a "horseshoe J" brand nursing "box 1" cows, two unbranded calves nursing "box 1" cows, and four yearlings with a "horseshoe J" brand.  Defendants claim that at the time the cattle were being impounded, they were unaware of who owned the cattle with the "horseshoe J" brand.[4]  However, they did know that no such cattle had authorization to graze on BLM land.[5]  While the cattle were being impounded, Plaintiff appeared and asserted his claim of ownership.  However, as most of the cattle being impounded bore Mr. Cramer's brand, the BLM employees decided to continue impounding the cattle and let the State Brand Inspector determine who owned the cattle,

---

[3]     In response to the instant motion, Plaintiff states he denies the undisputed fact at box 24.  However, Plaintiff has already acknowledged this sales agreement.  See Plaintiff's response to Defendant's motion to dismiss, Doc. 32 at 8.

[4]     Plaintiff "denies" this claim.  However, it is included here as background and is incidental as a majority of the cattle (30 out of 34) were either branded "box 1" or were nursing "box 1" cows, which Plaintiff does not dispute.

[5]     Plaintiff acknowledges he did not have authorization to permit his cattle to graze BLM land by admitting undisputed fact at box 12.  See Plaintiff's Response (Doc. 53), at 7.  However, he argues that prior to the cattle being impounded, he should have been provided notice of the violation and the opportunity to remove his cattle from BLM lands.

1  especially since some of the calves with the "horseshoe J" brand were nursing "box 1" cows,

2  which was unusual.  Plaintiff was informed the State Brand Inspector would have to make a

3  determination as to the ownership of the cattle.  Plaintiff received a Notice of Trespass on April

4  18, 2005.  Plaintiff met with defendant Kuyper at least twice, on April 22, 2005, and May 3,

5  2005.  At no time did Plaintiff present Defendants with certificate of brand inspection to prove

6  his ownership of the impounded cattle.

7                  2.      Impounding the Cattle

8          Plaintiff is generally claiming he was denied due process prior to the cattle being

9  impounded.  To that extent, he is claiming he was not provided notice prior to the impound.  The

10  regulations, cited above by Defendants, require notice be provided to all known owners of cattle

11  grazing on BLM land without authorization.  The Defendants acknowledge that at least some of

12  the cattle impounded on April 6, 2005, appeared to belong to someone other than Mr. Cramer, to

13  whom they had previously served a trespass notice.  They claim the BLM employees checked the

14  California brand book in order to identify the owner of the "horseshoe J" brand, but were unable

15  to find a registered owner of that brand in the version they had with them.  They therefore

16  continued with the impound.  However, they did discover Plaintiff was the registered owner of

17  that brand once they were back at the office.  But by then, the cattle had been impounded.

18  Plaintiff asserted ownership of all the cattle while they were being impounded, but did not have

19  any proof with him.

20          While Defendants acknowledge Plaintiff was not provided any notice prior to the

21  April 6, 2005, impound of the cattle, it is undisputed that Plaintiff was served with the trespass

22  notice on April 18, 2005.  The notice provided to Plaintiff informed him that the cattle had been

23  grazing without authorization in violation of federal law, and that he had five days to present

24  evidence to the BLM that he was not trespassing or to effect a settlement for the trespass.

25  Plaintiff acknowledges he received this notice, and had contact with Defendants, meeting with

26  them on at least two occasions.  He also affirms that he was informed that he had to prove his

1   ownership of the cattle to the State Brand Inspector, pursuant to California law.

2         It appears to the undersigned that Defendants, or at least the BLM employees, may

3   not have followed the letter of the law in providing Plaintiff, as a registered owner of the

4   "horseshoe J" brand, with notice prior to the cattle being impounded.  However, that does not

5   necessarily mean Plaintiff's due process rights were violated.  Assuming for the moment that the

6   impounding of the cattle was enough to "finally" deprive Plaintiff of his property, there are times

7   when a postdeprivation notice and opportunity to be heard will be sufficient to provide the

8   property owner due process.  See Boddie v. Connecticut, 401 U.S. at 378-79.

9         Here, there is no dispute that a majority of the cattle impounded on April 6, 2005,

10  bore the "box 1" brand, and that the "box 1" brand belonged to Mr. Cramer.  Therefore, even if

11  Plaintiff appeared at the impound site during the impound and asserted a claim of ownership over

12  these "box 1" cattle, without providing the BLM employees with proof of ownership at that time,

13  there was no denial of due process.  The BLM employees had no proof that these cattle belonged

14  to Plaintiff, and they had provided the necessary notice to Mr. Cramer, who was the registered

15  owner of the cattle bearing the "box 1" brand.  That there were a few other cattle mixed in,

16  bearing the "horseshoe J" brand does not invalidate the notice to Mr. Cramer, the registered

17  owner of a majority of the cattle.

18        As to the "horseshoe J" branded cattle, Defendants claim in their declarations that

19  they had no knowledge out in the field as to the owner of that brand.  While Plaintiff disputes this

20  statement, he has not provided any evidence to support a conclusion otherwise, nor does Plaintiff

21  claim he had proof of ownership out in the field.  Defendants acknowledge they did not have the

22  most recent update to the brand book out in the field, and upon return to the office they

23  discovered that Plaintiff was in fact the registered owner of that brand.  However, this only

24  applies to the four yearlings who were branded "horseshoe J."  As Defendants also claim in their

25  declaration, while impounding cattle, it is not unusual to have a few stray cattle intermingled in

26  the herd they are impounding.  When this happens, the BLM will "request the State Brand

1   Inspector to provide an ownership determination, and then return the cattle as appropriate."

2   (Mauck Declaration, Doc. 46, at 3). This is essentially what happened in this case.[6]

3          The Defendants provided Plaintiff with what could be described as

4   postdeprivation notice that the cattle were impounded. Plaintiff was then provided an

5   opportunity to prove the cattle impounded were his, and was informed about the proper

6   procedures to do so. He was specifically informed that he had to prove his claim of ownership to

7   the State Brand Inspector, pursuant to state law, and was provided information on how to contact

8   the brand inspectors.

9          Therefore, the question before the court is, again assuming the impounding of the

10   cattle constituted a "final" deprivation of Plaintiff's property, whether this was a situation where

11   postdeprivation notice was acceptable. The court therefore looks to the three factors the Supreme

12   Court established in Mathews v. Eldridge, 424 U.S. at 335. Here, Plaintiff's private interest is

13   substantial. It can be assumed that, generally, cattle are owned as an economic enterprise.

14   Plaintiff likely had interest in the cattle as a source of income. That private interest is substantial.

15   However, so is the government interest at issue here, specifically preserving the integrity of

16   public land. Balancing these two interests in this particular situation, the balance would tip in

17   favor of the government interest. Cattle are moveable property, which, while grazing on BLM

18   property without authorization, can inflict substantial damage to public land and then be removed

19   without the imposition of liability on the owner. It is also possible for cattle to migrate to

20   inaccessible areas of public lands, and for BLM to lose track of the cattle as they move. This

21   situation is similar to an owner being denied a pre-deprivation hearing for a vehicle, which is

22   

---

23      [6]   Although the Defendants knew at the time of the impound that there were some

24   cattle with the "horseshoe J" brand included in the impound, and that Plaintiff was asserting his
ownership of all the cattle, without full knowledge as to the true ownership of the cattle, and

25   given that the majority of the cattle had the "box 1" brand, it was not unreasonable for the
Defendants to follow their normal custom of impounding the entire herd and sorting it out after

26   the fact. This is especially true here, where the only cattle having questionable ownership were
four yearlings, out of a herd of 34 cattle.

towed and impounded if in violation of traffic laws.  See Goichman v. Rheuban Motors, Inc., 682

F.2d 1320, 1323-24 (9th Cir. 1982) (finding no pre-deprivation hearing required for towed

vehicles).  As with other moveable property, such as a vehicle, impounding cattle prior to

providing an owner a pre-deprivation hearing may not violate a owners due process rights.

Especially in a case like this, where the majority of the cattle impounded were impounded after

notice was provided to the known owner, and no action was taken.  Where a few other cattle

were incidentally impounded, and post-deprivation notice and opportunity to be heard was

provided, there cannot be a violation of due process.  Weighing in the third factor does not

change the balance.  There is little risk of erroneous deprivation where, as here, the ownership of

cattle is established through the State Brand Inspector.  The only cattle likely to be impounded

erroneously are those cattle whose owners do not follow the state law procedures to properly

transfer or establish ownership.  In addition, requiring BLM employees to allow unauthorized

cattle to continue grazing on public land until ownership of all the cattle in a herd can be

determined and notice provided is not reasonable, especially where there are only a few stray

cattle in the herd and BLM can lose track of the unauthorized grazers.

> The undersigned concludes that Defendants did not violate Plaintiff's due process

rights by failing to providing him notice of the trespass prior to impounding the cattle.

Defendants offer evidence that Plaintiff was provided an opportunity to assert his ownership over

the impounded cattle and Plaintiff was unable to do so.  Plaintiff acknowledges receipt of the

notice of trespass after the cattle were impounded, as well as Defendants providing him an

opportunity to be heard by meeting with him on at least two occasions.  The amount of time

Plaintiff was deprived of his alleged property, between the impound and the notice and

opportunity to be heard, was minimal.  He therefore was provided notice and an opportunity to be

heard shortly after the cattle were impounded, and prior to the disposal of the cattle, as discussed

below.

/ / /

1          3.      Disposal of the Cattle

2          Plaintiff's due process claim could also include a claim that after the cattle were

3  impounded, he was not provided notice and an opportunity to be heard prior to the disposal of the

4  cattle, but he does not articulate this claim well.  The undersigned finds, as discussed above, that

5  notice and opportunity to be heard prior to the original impounding of the cattle was unnecessary,

6  given that the cattle were only impounded and not destroyed, and Plaintiff was only deprived of

7  his alleged property for a short time.  This second incident, however, culminated in the

8  destruction of Plaintiff's interest in the cattle as they were sold and/or turned over to the State.

9          Plaintiff acknowledges receipt of the Trespass Notice on April 18, 2005.  He

10  admits he met with Defendants on at least two occasions.  He also acknowledges that Defendants

11  informed him that he needed to contact the State Brand Inspector, who would have to make a

12  determination as to ownership.  Although he claims he was unable to reach the state brand

13  inspector in a timely fashion, arguing that he was unable to reach a State Brand Inspector until

14  May 5, 2005, and that he was not allowed to present proof of ownership to the State Brand

15  Inspector, Plaintiff does not claim the Defendants are the ones who denied Plaintiff of that

16  ability.  Instead, he states he was unable to make contact with the state brand inspector, and the

17  state brand inspector did not return his calls.[7]  However, he acknowledges that the Defendants

18  provided him with information on how to contact the State Brand Inspector.[8]

19          In addition to the undisputed trespass notice, Defendants also claim Kuyper

20  served Plaintiff with a Notice to Redeem on May 5, 2009, by personally delivering a copy of the

21

22      [7]      Plaintiff apparently was unable to connect with a state brand inspector until May
   5, 2005.  However, the inspection of the impounded cattle apparently occurred on or before April
23  28, 2005.  Plaintiff argues that defendant Kuyper told him on May 3, 2005, that the brand
   inspection had yet to be set.  Even if the court accepts this statement as fact, that does not prove
24  defendant Kuyper had knowledge on May 3, 2005, that the inspection had already taken place, or
   that defendant Kuyper interfered with Plaintiff's ability to connect with the state brand inspector
   to prove his ownership.
25

26      [8]      It is also important to note that the State Brand Inspector was not named as a
   defendant in this case, nor was any other State actor.  This case is only against BLM employees.

14

1  notice to his residence, leaving a copy with Plaintiff's wife.  Although Plaintiff denies this as an

2  undisputed fact, Defendants have provided the court with a copy of the notice, and Kuyper's

3  declaration in which he declares, under penalty of perjury, that he personally delivered the notice

4  to Plaintiff's residence, serving Plaintiff's wife.  The Notice to Redeem informed both Plaintiff

5  and Mr. Cramer that the owner of the livestock may redeem the cattle at anytime prior to the date

6  of sale as provided by the appropriate regulations, including the payment of fees and costs.  This

7  notice also informed the individuals that the date of sale was set for May 13, 2005, and provided

8  them with the necessary information on how to contact the BLM and how to find and inspect the

9  cattle.  While Plaintiff "denies" this as an undisputed fact, he makes no argument in his

10  opposition that he did not receive the Notice to Redeem.

11          Plaintiff takes issue with the State Brand Inspector's determination that the "box

12  1" cattle belonged to Mr. Cramer.  He states that the determination was simply the inspector's

13  opinion, which was rendered prior to Plaintiff being allowed an opportunity to produce evidence

14  of ownership.  In addition, this opinion was rendered on April 28, 2005, yet when Plaintiff last

15  spoke with the Defendants, on May 3, 2005, no mention was made about the opinion letter.  The

16  undersigned finds none of these are necessarily inconsistent.  If an inspector is charged with

17  making an ownership determination, certainly his opinion thereof would be sufficient.  However,

18  an inspector's opinion as to ownership is not at issue here.  The inspector is not a defendant in

19  this action, and whether the inspector's determination of ownership was erroneous or not does

20  not effect whether Plaintiff's due process rights were violated by failing to provide him notice

21  and opportunity to be heard.  In addition, that the determination was made on April 28, 2005,

22  does not necessarily mean Defendants possessed that knowledge as of May 3, 2005.  It is not

23  clear to the court how that ownership determination was disseminated to Defendants, but

24  assuming that it was mailed, a few days passage before receipt of the opinion letter would be

25  expected.  While not addressed by the parties, it is possible that Defendants did not have

26  knowledge of the determination of ownership at the time of their meeting with Plaintiff on May

15

3, 2005.  Regardless of whether they had that knowledge, defendant Kuyper again told Plaintiff to contact the State Brand Inspector with his proof of ownership.  It was not too late at that time for Plaintiff to prove his ownership of the cattle to the State Brand Inspector.  The cattle had not been disposed of, and the final Notice to Redeem had not been issued.

        The regulations provide that the known owner of cattle grazing on BLM land without authorization must be provided notice of the violation, notice of the pending impoundment, and notice to redeem prior to the sale.  Here, Plaintiff was not provided prior notice of the violation or pending impoundment.  However, he had actual notice of the impoundment, as he was present at the location when the cattle were impounded.  He was subsequently provided the notices of violation and impoundment, and was provided time and opportunity to prove his ownership of the cattle, as discussed above.  Plaintiff failed to do so.  Plaintiff was informed that the State Brand Inspector was the one to make the ownership determination, and was directed to contact the inspector to provide proof of ownership.  Defendants did not have the authority to make that determination, and Plaintiff does not argue they did.  There is nothing in the record before the court that the two individual defendants, both BLM employees, in any way prohibited Plaintiff from contacting the inspector and/or proving his ownership.  In fact, in addition to the notices they provided to Plaintiff, they met with Plaintiff on at least two separate occasions prior to the sale of the cattle, had telephone conversations with him in which he was advised to contact the inspector, and provided Plaintiff with contact information for two different inspectors.  Plaintiff failed to support his claim of ownership.[9]

/ / /

---

[9]     Plaintiff also has not provided the court with evidence that he could prove his ownership of the impounded cattle.  At best, Plaintiff produced to Defendants a "Sales Agreement" signed by Mr. Cramer, in which Mr. Cramer purportedly agreed to sell Plaintiff 13 head of cattle.  This agreement does not meet the California requirements for transfer of cattle.  In addition, even if this agreement was sufficient to transfer ownership of the 13 cattle it refers to, that does not encompass all of the cattle that were impounded.  It would leave at least 12 cattle unaccounted for, not including the yearlings and calves.

1    Therefore, the Defendants reasonably followed their rules, regulations and standard practice, and

2    disposed of the cattle.

3            3.    Conclusion

4            Defendants offer evidence that it was unreasonable, given the situation at hand, to

5    provide Plaintiff with pre-impoundment notice, that Plaintiff was provided notice following the

6    impound of the cattle and was given an opportunity to prove his ownership interest in the cattle,

7    but was unable to do so.  The Defendants also offer evidence that they reasonably  followed

8    proper procedures in impounding the cattle, establishing ownership of the cattle, and disposing of

9    the cattle.  Plaintiff has not tendered evidence of specific facts establishing that a genuine issue as

10   to any material fact actually exists.  Even if the court were to construe Plaintiff's opposition and

11   the statement from Andrew Roberts as admissible affidavits, Plaintiff has not met his burden to

12   show there is evidence such that a reasonable jury could return a verdict in his favor.[10]  In fact,

13   the statement from Mr. Roberts supports Defendants' argument that they met with Plaintiff and

14   provided him information on contacting the State Brand Inspector in order to prove his

15   ownership.

16           Plaintiff acknowledges that Defendants notified him on April 18, 2005, and again

17   on April 22, 2005, that he needed to contact the State Brand Inspector as he is the one who makes

18   the ownership determination.  Although Plaintiff argues several meetings with Defendants were

19   set up and canceled, it is clear that Defendants lacked the authority to make the determination as

20   to ownership of the cattle, and Plaintiff had to prove his ownership claims to the State Brand

21   Inspector.  Therefore, canceling some of the meetings Plaintiff wished to have did not hamper his

22   ability to prove to the State Brand Inspector he was the rightful owner of the cattle.  Plaintiff has

23

24           [10]    Although Mr. Robert's statement was notarized, it is not a declaration signed
     under penalty of perjury.  Plaintiff's argument is written in the form of a declaration, identifying
25   events happening on specific dates.  Plaintiff's "declaration," if it can be so characterized, is
     similarly not signed under penalty of perjury.  However, the court has considered both of these
26   statements in the best possible light to Plaintiff, the non-moving party.

1  not claimed that Defendants prevented him in any way from contacting the State Brand Inspector

2  and proving his ownership.  Instead, Defendants told him several times to contact the inspector,

3  and provided him the telephone numbers for two different inspectors.

4          Plaintiff admits that most of the cattle impounded had the "box 1" brand.  He also

5  does not contest that the "box 1" brand belongs to Mr. Cramer.  He further admits that he did not

6  present a certificate of brand inspection for any of the 34 cattle impounded.  Pursuant to

7  California law, the "[t]ransfers of [] cattle to other owners . . . must be supervised by state brand

8  inspectors and evidenced by a trail of bills of sale and legally altered brands." People v. Casey,

9  49 Cal. Rptr. 2d 372, 374 (Cal. App. Dep't Super. Ct. 1995).  Plaintiff has provided no evidence

10  that he legally transferred ownership of the cattle that were impounded by having the transfer

11  supervised by a State Brand Inspector or having the brands legally altered.  He therefore has not

12  provided the court with evidence that had he been allowed to meet with Defendants at the

13  meetings they canceled, that he would have been able to prove his ownership.

14          Based on the above, the undersigned does not find any genuine issue as to any

15  material fact actually exists.  Taking the record as a whole, and drawing all reasonable inferences

16  from the facts before the court in favor of Plaintiff, the undersigned cannot find a rational trier of

17  fact could find for Plaintiff.  The undersigned recommends Defendants Motion for Summary

18  Judgment be granted.

19  **III.   QUALIFIED IMMUNITY**

20          Government officials enjoy qualified immunity from civil damages unless their

21  conduct violates "clearly established statutory or constitutional rights of which a reasonable

22  person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In general,

23  qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

24  law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

25  immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting

26  the injury, the facts alleged show the defendant's conduct violated a constitutional right.  See

1  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next

2  step is to ask whether the right was clearly established.  See id.  This inquiry "must be undertaken

3  in light of the specific context of the case, not as a broad general proposition . . . ."  Id.  "[T]he

4  right the official is alleged to have violated must have been 'clearly established' in a more

5  particularized, and hence more relevant, sense:  The contours of the right must be sufficiently

6  clear that a reasonable official would understand that what he is doing violates that right."  Id. at

7  202 (citation omitted).  Thus, the final step in the analysis is to determine whether a reasonable

8  officer in similar circumstance would have thought his conduct violated the alleged right.  See id.

9  at 205.

10          When identifying the right allegedly violated, the court must define the right more

11  narrowly than the constitutional provision guaranteeing the right, but more broadly than the

12  factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667

13  (9th Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be

14  sufficiently clear that a reasonable official would understand [that] what [the official] is doing

15  violates the right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the court

16  concludes that a right was clearly established, an officer is not entitled to qualified immunity

17  because a reasonably competent public official is charged with knowing the law governing his

18  conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff

19  has alleged a violation of a clearly established right, the government official is entitled to

20  qualified immunity if he could have "reasonably but mistakenly believed that his . . . conduct did

21  not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see also

22  Saucier, 533 U.S. at 205.

23          The first two steps in the qualified immunity analysis involve purely legal

24  questions.  See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a

25  legal determination based on a prior factual finding as to the government official's conduct.  See

26  Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  In resolving these issues, the court must

1   view the evidence in the light most favorable to plaintiff and resolve all material factual disputes

2   in favor of plaintiff.  See Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

3           Plaintiff states in his complaint that Defendants violated his due process rights by

4   not providing him notice and an opportunity to be heard, and not allowing him the ability to

5   prove his ownership of the cattle in question.  Defendants argue the facts show they did not

6   violate Plaintiffs due process rights.  As discussed above, the undersigned finds that no violation

7   of Plaintiff's due process right occurred.  Plaintiff admits Defendants provided him with notice

8   of the impound shortly thereafter, informed him that the law required him to prove his ownership

9   interest to the State Brand Inspector and provided him with contact information for the

10  inspectors.  He also concedes that Defendants met with him on at least two separate occasions

11  after the impound occurred for Plaintiff to provide proof of ownership and/or that the cattle were

12  not in trespass.  Defendants relied on the State Brand Inspector's determination that the "box 1"

13  cattle belonged to Mr. Cramer, and there was insufficient documentation as to the "horseshoe J"

14  cattle.  Finally, Defendants issued a Notice to Redeem, which was served on Plaintiff at his

15  residence, a week before the cattle were sold at auction.  Therefore, Defendants' conduct did not

16  violate Plaintiff's due process rights.

17          However, even assuming for the moment that there was a violation of Plaintiff's

18  due process rights, and that this right was clearly established, the final question is whether a

19  reasonable officer in a similar circumstance would have thought his conduct violated the alleged

20  right.  The undersigned finds that Defendants could have reasonably believed that their conduct

21  did not violate plaintiff's rights.  Defendants followed the regulations as to the notice provided,

22  the determination of ownership, and the sale of the cattle.  There is nothing in the record before

23  the undersigned which could indicate that a reasonable officer in the same situation would have

24  believed his actions were violating Plaintiff's due process rights.  Accordingly, Defendants are

25  entitled to qualified immunity.

26  / / /

**IV.     CONCLUSION**

Based on the foregoing, the undersigned recommends that:

1.     Defendants' motion for summary judgment (Doc. 46) be granted; and

2.     Defendants be granted qualified immunity.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


DATED: July 27, 2009


_Craig M. Kellison_
_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE